UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-CR-00146-1H(2)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| WILLIE LAZZLO HENDERSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant's motion to suppress [DE-29]. The Government filed a response [DE-31] in opposition to the motion to suppress. To further develop the record, the Court conducted an evidentiary hearing on October 20, 2011, at which the Government and Defendant with counsel appeared. Accordingly, the matter is now ripe for decision.

## STATEMENT OF THE CASE

On May 19, 2011, a Federal Grand Jury returned a single count indictment against Willie Lazzlo Henderson ("Defendant"), which charged that, "[o]n or about November 2, 2010, in the Eastern District of North Carolina, the defendant, WILLIE LAZZLO HENDERSON, having been previously convicted of a crime punishable by a term of imprisonment exceeding one (1) year, did knowingly possess in and affecting commerce, a firearm, to wit: a Norinco, model 213, 9mm handgun, in violation of Title 18, United States Code, Sections 922(g)(1) and 924." Indictment at 1 [DE-1].

On September 12, 2011, Defendant filed the instant Motion to Suppress [DE-29]. In his motion, Defendant contends that law enforcement officers lacked probable cause or reasonable

suspicion leading up to his arrest on November 2, 2010 and that, therefore, all evidence seized as a result of that arrest should be suppressed under the Fourth Amendment. On September 12, 2011, the Government filed a Response [DE-31] in opposition to the motion to suppress. In its response, the Government argues that there was in fact reasonable suspicion and that, accordingly, the temporary detention and frisk of Defendant by law enforcement officers was proper and lawful.

## STATEMENT OF THE FACTS

Officer Bryan Simmons ("Officer Simmons") and Officer David Elliott ("Officer Elliott"), both law enforcement officers with the Henderson Police Department ("HPD") in Henderson, North Carolina, testified at the evidentiary hearing on October 20, 2011 regarding a stop and search of Defendant that took place on November 2, 2010. They were the sole witnesses, and the Court finds the following facts based on their testimony.

### 1. Testimony of Officer Simmons

Officer Simmons has been a law enforcement officer with the HPD since January of 2009. Currently, he is a patrol officer. Officer Simmons was on duty on November 2, 2010, dressed in his patrol officer uniform and driving a marked patrol vehicle. At approximately 1:20 p.m., he received a 911 dispatch call directing him to 243 Swain Street in Henderson in response to a domestic disturbance. He was nearby at the time of the call, and responded within 2-3 minutes. Officer Simmons testified that he was familiar with 243 Swain Street, having responded to at least two prior domestic disturbance calls at that address within the previous six months.

Upon arriving at 243 Swain Street, Officer Simmons spoke with a woman who identified herself as Pamela Bullock. Officer Simmons was previously familiar with Ms. Bullock, having

2

Case 5:11-cr-00146-H   Document 45   Filed 11/04/11   Page 2 of 15

suspicion leading up to his arrest on November 2, 2010 and that, therefore, all evidence seized as a result of that arrest should be suppressed under the Fourth Amendment. On September 12, 2011, the Government filed a Response [DE-31] in opposition to the motion to suppress. In its response, the Government argues that there was in fact reasonable suspicion and that, accordingly, the temporary detention and frisk of Defendant by law enforcement officers was proper and lawful.

## STATEMENT OF THE FACTS

Officer Bryan Simmons ("Officer Simmons") and Officer David Elliott ("Officer Elliott"), both law enforcement officers with the Henderson Police Department ("HPD") in Henderson, North Carolina, testified at the evidentiary hearing on October 20, 2011 regarding a stop and search of Defendant that took place on November 2, 2010. They were the sole witnesses, and the Court finds the following facts based on their testimony.

### 1. Testimony of Officer Simmons

Officer Simmons has been a law enforcement officer with the HPD since January of 2009. Currently, he is a patrol officer. Officer Simmons was on duty on November 2, 2010, dressed in his patrol officer uniform and driving a marked patrol vehicle. At approximately 1:20 p.m., he received a 911 dispatch call directing him to 243 Swain Street in Henderson in response to a domestic disturbance. He was nearby at the time of the call, and responded within 2-3 minutes. Officer Simmons testified that he was familiar with 243 Swain Street, having responded to at least two prior domestic disturbance calls at that address within the previous six months.

Upon arriving at 243 Swain Street, Officer Simmons spoke with a woman who identified herself as Pamela Bullock. Officer Simmons was previously familiar with Ms. Bullock, having

attended high school with her in Henderson. On cross examination, Officer Simmons indicated that Ms. Bullock smelled of alcohol, but that she was not extremely intoxicated. He also indicated that he knew Ms. Bullock had "issues." Ms. Bullock reported to Officer Simmons that she had been in a fight with her boyfriend Willie Henderson, Defendant in this action. Ms. Bullock told Officer Simmons that Defendant had taken a black handgun away from her and left the residence with it in order to "sell it for drugs." She reported that Defendant had "just left," heading towards East Andrews Avenue on foot, and that he was wearing a red jacket. She also told Officer Simmons that Defendant was a convicted felon. Officer Simmons testified that he was familiar with Defendant prior to that occasion, and that though he had not previously known that Defendant had a past felony conviction, he was already aware that Defendant was a reported drug user and knew what Defendant looked like.

Officer Simmons did not observe any visible injuries on Ms. Bullock's person. Therefore, he did not swear out a warrant at the scene and instead advised Ms. Bullock of her right to go to the Magistrate and seek one herself. He testified that his actions were in conformity with an unwritten HPD policy which makes it optional for an officer to swear out a warrant in response to a domestic disturbance call so long as no visible injuries are present. Officer Simmons also testified that it was not unusual when responding to domestic disturbance calls to see no visible injuries and that this did not affect his opinion of Ms. Bullock's credibility.[1] Accordingly, he not only believed her allegations of domestic assault, but also found her information that Defendant was a convicted felon who had left the residence in possession of a firearm to be credible and, therefore, left the scene in his vehicle at approximately 1:30 p.m. to search the area for Defendant.

---

[1] Officer Simmons indicated on cross examination that he had similarly not sworn out warrants on the two previous occasions he had visited 243 Swain Street, but again testified that this also did not affect his opinion of Ms. Bullock's credibility.

3

Officer Simmons testified that he knew Defendant's destination as indicated by Ms. Bullock, a particular stretch of East Andrews Avenue, to be an "open air drug market," and that he alerted other law enforcement officers of Defendant's possible whereabouts via radio. Approximately ten minutes later, Officer Simmons encountered another HPD officer, Officer Elliott, in the parking lot of the nearby Henderson Food Mart. While sitting in their respective vehicles in the parking lot, the two officers had a conversation about the situation. During this conversation, Officer Simmons saw a man that he recognized as Defendant walking up an adjacent street, and alerted Officer Elliott to his presence. At that point, Officer Simmons pulled out of the parking lot in his vehicle, and followed Defendant.

When Officer Simmons reached Defendant, he pulled up beside him and said "Hey Willie, I want to talk to you." Officer Simmons testified that Defendant was approximately five feet away from the vehicle and made eye contact before continuing to walk without saying anything. Therefore, Officer Simmons stopped his vehicle, exited, and said "Hey Willie, I want to talk to you" two more times. Shortly thereafter, Officer Elliott pulled up behind Officer Simmons and also exited his vehicle. Officer Simmons testified that Defendant took several rapid steps, as if he were going to run, and then stopped. At that point, Officer Simmons testified that both officers brandished their weapons.

Officer Simmons next asked Defendant to put his hands over his head. Officer Simmons testified that he did this because Defendant's hands were in front of him and he was concerned about the possibility that the handgun might be in Defendant's waistband. At first, Defendant did not respond, and both officers kept their weapons brandished. However, after being asked "at least twice," Defendant complied with Officer Simmons' request. Next, Officer Simmons instructed Officer Elliott to keep his weapon trained on Defendant, re-holstered his own weapon,

and approached Defendant from behind. Officer Simmons took each of Defendant's hands down from over his head separately, and handcuffed him for officer safety. Officer Simmons also asked Defendant "Where's the gun?" to which Defendant replied "in my waistband." Subsequently, Officer Simmons conducted a frisk of Defendant from behind, during which he felt an object on the right side of Defendant's waist. Officer Elliott then approached, removed the object, which was a handgun, and secured it. Upon running a search, it was revealed that the handgun was not stolen. Defendant was subsequently placed under arrest, secured in a vehicle, and transported to the station.

### 2. Testimony of Officer Elliott

Officer Elliott has been a law enforcement officer with the HPD since June of 2010. Currently, he is a patrol officer. Officer Elliott was on duty on November 2, 2010, dressed in his patrol officer uniform and driving a marked patrol vehicle. At approximately 1:30 p.m., he heard a radio call go out from Officer Simmons regarding an individual suspected to be in possession of a firearm. The call indicated that the suspect was a black male of small build with long dreadlocks and that he was wearing a red jacket and blue jeans. Officer Elliott testified that he was not familiar with Defendant prior to that day. However, he was in the area and so he began to look for the suspect.

Officer Elliott testified that, while searching for the suspect, he happened to encounter Officer Simmons in the parking lot of the Henderson Food Mart, and that they had a conversation, during which Officer Simmons saw Defendant walking nearby. Officer Simmons alerted Officer Elliott to Defendant's presence and the fact that he was the suspect, and both officers pulled out of the parking lot and followed Defendant. Officer Elliott testified that he was driving in his vehicle right behind Officer Simmons' vehicle, and that he had his windows

5

down and could hear Officer Simmons say to Defendant "Hey, I want to talk to you." Thereafter, Officer Elliott exited his vehicle after Officer Simmons did so, and observed Defendant continue to walk with his hands in front of him, despite being ordered to stop by Officer Simmons, before eventually stopping and raising his hands. Officer Elliott also testified that he drew his weapon "at the same time" as Officer Simmons.

Next, Officer Elliott testified that he kept his weapon trained on Defendant for officer safety while Officer Simmons handcuffed Defendant and then announced that he was going to frisk him. Officer Elliott also testified that, at that point, he heard Defendant announce that he had a gun in his right front waistband, so he stepped up and retrieved it from Defendant's person. Thereafter, Officer Elliott took the handgun to his vehicle, at which time he discovered that it was not loaded. Upon running a search on the serial number, Officer Elliott also learned that the handgun was not stolen. He gave the handgun to Officer Simmons and was not involved in any further booking procedures.

## **FRAMEWORK FOR ANALYSIS**

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. To protect this right, a warrantless arrest is permissible only when there is probable cause to believe that the person being arrested is committing or has committed a felony based on the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). However, an officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). As with probable cause determinations, courts assess the existence of reasonable suspicion for these so-called

*Terry* stops by examining the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In so doing, courts must consider "all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect." *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989). The reasonable suspicion standard is not particularly onerous; however, more than an "inchoate and unparticularized suspicion or 'hunch'" is required. *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27). A number of factors have been found to properly contribute to an officer's determination that there is reasonable suspicion, including presence in a high crime area, *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993), information received from informants, *Alabama v. White*, 496 U.S. 325, 329-30 (1990), and evasive conduct, *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997). If there is reasonable suspicion to conduct a *Terry* stop of a suspect and the officer reasonably believes that the suspect may be armed and dangerous, the officer may then conduct a so-called *Terry* frisk and limited search for weapons. *United States v. Mayo*, 361 F.3d 802, 805 (4th Cir. 2004).

## **DISCUSSION**

Defendant makes two main arguments in his motion to suppress. First, he argues that he was arrested beginning as early as the onset of the stop and that the officers lacked the requisite probable cause to effectuate such a warrantless arrest. Second, he argues that, even assuming, *arguendo*, that he was not arrested until after the handgun was seized, the officers lacked the requisite reasonable suspicion to initiate even an investigatory *Terry* stop and frisk. Therefore, Defendant argues that all evidence seized as a result of the November 2, 2010 encounter should be suppressed under the Fourth Amendment. Each of these arguments will be addressed in turn.

## 1. Probable cause to effectuate warrantless arrest

Defendant first argues that he was under arrest when he was commanded to stop by Officer Simmons, or, if not then, when the officers drew their weapons, or, if not then, when he was handcuffed, or, if not then, when he was frisked. He contends that at all of these points, the officers lacked probable cause to effectuate his arrest, and that, therefore, it was improper. The Government did not address the issue of whether there was probable cause at any of these points either in its responsive brief or at the hearing, choosing instead to take the position that the November 2, 2010 encounter was clearly an investigatory *Terry* stop and frisk and that there was reasonable suspicion to support such a stop and frisk.

In evaluating whether an encounter is an investigatory *Terry* stop or a warrantless arrest, the Fourth Circuit has held that a show of force does not, standing alone, dictate that an encounter be treated as an arrest. *See, e.g., United States v. Sinclair*, 983 F.2d 598, 603 (4th Cir. 1993) (drawing weapons in order to detain suspects did not convert *Terry* stop into arrest); *Crittendon*, 883 F.2d at 329 (handcuffing suspect for officer safety did not convert *Terry* stop into arrest). Instead, whether a suspect has been arrested is an objective determination made by considering "whether the suspect's freedom of action has been curtailed to a degree associated with formal arrest." *United States v. Elston*, 479 F.3d 314, 319 (4th Cir. 2007) (quotation omitted). However, "the perception that one is not free to leave is insufficient to convert a *Terry* stop into an arrest. A brief but complete restriction of liberty is valid under *Terry*." *Id.* (quoting *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995)).

Here, Defendant asks the Court to find that he was under arrest at some point prior to the seizure of the handgun and that the totality of the circumstances suggests probable cause was lacking to effectuate such an arrest. The Court cannot so find. It is well-settled that officers who

reasonably believe a suspect to be armed and dangerous do not exceed the limits of a *Terry* stop by drawing their weapons and/or placing the suspect in handcuffs. *See, e.g.*, *Elston*, 479 F.3d at 320. As a result, the officers' decision to draw their weapons and handcuff Defendant does not serve to *per se* elevate what was otherwise an investigatory *Terry* stop into a warrantless arrest, and Defendant acknowledged as much both in his brief and at the hearing. Furthermore, the Court notes that the officers were likely further justified in using force by the fact that Defendant did not initially obey Officer Simmons' commands to stop and make his hands visible, and that though Defendant's restriction of liberty was complete, it was also brief. As a result, it is clear to the Court that what transpired was an investigatory *Terry* stop and frisk, and that, therefore, the presence or absence of reasonable suspicion is the relevant inquiry. Accordingly, finding no merit in Defendant's contention that he was the subject of a warrantless arrest which lacked probable cause, the Court moves on to address Defendant's second argument.

**2. Reasonable suspicion to initiate investigatory *Terry* stop and frisk**

Defendant next argues that, even assuming, *arguendo*, that he was not under arrest until after the handgun was seized, the officers lacked the requisite reasonable suspicion to initiate even an investigatory *Terry* stop and frisk. To that end, Defendant asks the Court to apply the legal standard for anonymous tipsters, as set forth in *Florida v. J.L.*, 529 U.S. 266 (2000), rather than that used for face-to-face informants, in order to find that the officers erred by relying on Ms. Bullock's information regarding Defendant without independently corroborating its accuracy. More specifically, Defendant argues that, because Officer Simmons saw no visible injuries on Ms. Bullock and chose not to swear out a warrant himself, Officer Simmons did not find Ms. Bullock to be wholly credible regarding her allegations of domestic abuse and, therefore, should not have found her to be wholly credible regarding her information as to

9

Case 5:11-cr-00146-H Document 45 Filed 11/04/11 Page 9 of 15

Defendant's actions and/or criminal history without independent corroboration. In response, the Government argues that, under the totality of the circumstances, the officers had reasonable suspicion based on articulable facts, including Ms. Bullock's information, to conduct a *Terry* stop of Defendant, detain him briefly to investigate potential criminal activity, and conduct a *Terry* frisk for officer safety.

In *Florida v. J.L.*, the police received an anonymous telephone tip that a young black male wearing a plaid shirt and standing at a bus stop was illegally in possession of a firearm. The anonymous informant did not give a name, and the police had no other evidence which would lead them to suspect the individual of illegal conduct. Therefore, put simply, the Supreme Court held that such an anonymous tip, without more, presented credibility and accountability concerns, and was insufficient to establish reasonable suspicion without independent corroboration. *Florida v. J.L.*, 529 U.S. at 270-74. Here, though conceding that face-to-face encounters are generally more reliable than anonymous ones, Defendant nonetheless asks the Court to find that Officer Simmons knew or should have known that Ms. Bullock's information was not entirely credible, apply the *Florida v. J.L.* anonymous tipster standard to her information despite the fact that she was not anonymous, and conclude that the officers erred in not independently corroborating her information before relying upon it. The Court cannot so conclude.

In support of his argument that Ms. Bullock should be treated as an anonymous tipster, Defendant makes much of Officer Simmons' decision not to swear out a warrant himself in response to the domestic disturbance call. Defendant argues that this decision indicates that Officer Simmons did not find Ms. Bullock to be entirely credible regarding her allegations of domestic assault and that, therefore, independent corroboration of her information regarding

Defendant's activities and criminal history should have been required. To the contrary, the Court finds that Officer Simmons' decision was consistent with HPD policy which makes it optional for an officer to swear out a warrant in response to a domestic disturbance call when there are no visible injuries. In so finding, the Court particularly notes Officer Simmons' specific testimony that it is not uncommon when responding to domestic disturbance calls to see no visible injuries and that this fact did not affect his opinion of Ms. Bullock's credibility. Furthermore, the Court considers it likely that Officers Simmons' decision to not swear out a warrant himself at that moment was influenced at least in part by his desire to immediately investigate a potential crime that might be underway, regarding which time was of the essence. Therefore, Officer Simmons' decision is sufficiently explained by other factors and does *not* necessarily mean, as Defendant suggests, that he did not find Ms. Bullock to be entirely credible.

The Court also notes that in *United States v. Christmas*, 222 F.3d 141 (4th Cir. 2000), a similar request to treat a face-to-face encounter as anonymous was soundly rejected by the Fourth Circuit. In *Christmas*, a law enforcement officer investigating a homicide was approached by woman who lived in the neighborhood. The woman, who gave her address but not her name and was intoxicated, indicated that there were people on a nearby porch, unrelated to the homicide, that were in possession of drugs and guns. The officer went to the indicated location, conducted a frisk of its occupants for officer safety, and retrieved a gun from the defendant's person. On appeal, the defendant in *Christmas* argued that the woman's tip should have been treated as indistinguishable from an anonymous tip because the officer had no prior knowledge of her credibility and did not corroborate her story, and that therefore, it could not serve as the basis for reasonable suspicion under *Florida v. J.L.*. However, the Fourth Circuit disagreed, holding instead that this type of face-to-face encounter did *not* pose the same

11

Case 5:11-cr-00146-H Document 45 Filed 11/04/11 Page 11 of 15

credibility problems because the officer had an opportunity assess the tipster's credibility and she gave her address, exposing herself to the risk of reprisal. *Christmas*, 222 F.3d at 143-45. Here, as in *Christmas*, Ms. Bullock exposed herself to the risk of reprisal and Officer Simmons had an opportunity to asses her credibility face-to-face. In addition, Officer Simmons *did* have prior knowledge of her credibility, and in fact testified that he had found her credible on several other occasions. Therefore, seeing no reason to deviate from the result in *Christmas*, the Court finds that the *Florida v. J.L.* anonymous tipster standard is similarly inapplicable to the instant circumstances.

However, in an apparent attempt to distinguish the instant case from *Christmas*, Defendant also argues that, because Officer Simmons had or should have had doubts as to Ms. Bullock's veracity, he was required to further investigate her statements before relying on them as a basis to conduct an investigatory *Terry* stop of Defendant, even though the encounter was face-to-face. Though conceding that the Fourth Circuit has never held any such thing, Defendant relies on two cases from other Circuits, *Panetta v. Crowley*, 460 F.2d 388 (2nd Cir. 2006) and *Beauchamp v. City of Noblesville, Indiana*, 320 F.3d 733 (7th Cir. 2003), for the proposition that, in the context of Section 1983 civil rights actions, further investigation of a witness' statements is required once a question has arisen about the veracity of those statements. In addition to the fact that Defendant's proffered cases are not controlling precedent in this Circuit and the fact that Defendant is asking the Court to extrapolate a rule for use here from cases that were not criminal in nature, the Court notes that, importantly, both *Panetta* and *Beauchamp* dealt with determining the existence of probable cause, which is governed by a stricter standard than that of reasonable suspicion. Therefore, the Court finds them inapposite and declines to accept Defendant's

12

continued invitation to establish a rule requiring independent corroboration of Ms. Bullock's face-to-face information.

Instead, relying upon the general standard for determination of reasonable suspicion, the Court agrees with the Government's position and finds that a number of articulable facts that criminal activity might be afoot supported the officers' stop of Defendant under the totality of the circumstances. Officer Simmons was familiar with both Ms. Bullock and Defendant and had responded to domestic disturbance calls involving the two of them at 243 Swain Street twice in the previous six months. Officer Simmons testified that, despite the lack of visible injuries on Ms. Bullock, he had no reason to doubt her allegations of domestic assault and in fact found her to be credible. Furthermore, Officer Simmons was previously aware of Defendant's reported drug use and East Andrews Avenue's reputation as an "open air drug market" and, thus, had reason to believe Ms. Bullock's assertions that Defendant was a convicted felon in possession of a handgun en route to a high crime area where he planned to sell it for drugs. Ms. Bullock's information was further corroborated by the fact that Defendant was initially spotted walking in the direction and wearing the clothing that Ms. Bullock had indicated. In addition, when Officer Simmons initially called Defendant by name, Defendant made eye contact but kept going, and ultimately only stopped after being ordered to do so several times and briefly appearing as if he were going to run. Therefore, based on the existence of all of these facts, the Court finds that Officers Simmons and Elliott had reason to believe that criminal activity might be afoot and that, as a result, the requisite reasonable suspicion existed to justify conducting an investigatory *Terry* stop of Defendant.[2] Similarly, the Court finds that the officers reasonably believed that Defendant might be armed and dangerous. The crime that Defendant was suspected of

---

[2] Moreover, even if *Florida v. J.L.* were the relevant standard for face-to-face encounters, the Court notes that a number of these facts tend to corroborate Ms. Bullock's information and Defendant's assertion that no evidence whatsoever corroborated Ms. Bullock's information is simply false.

13

committing, based on Ms. Bullock's information, was that of being a felon in possession of a firearm, which by definition is a crime which would have given the officers reason to believe that Defendant might be armed and dangerous. Furthermore, Defendant was not immediately compliant with Officer Simmons' commands to stop or raise his hands above his head. Therefore, in addition to having reasonable suspicion sufficient to justify a *Terry* stop of Defendant, the Court finds that Officers Simmons and Elliott also were justified in conducting a *Terry* frisk of his person for officer safety.

In sum, the Court finds that, based on Ms. Bullock's conversation with Officer Simmons and subsequent events, the officers were aware of sufficient articulable facts to justify their suspicion that criminal activity was afoot—namely, that Defendant was a convicted felon in possession of a firearm—and that, therefore, the investigatory *Terry* stop of Defendant was proper. Furthermore, the Court finds that the officers reasonably believed, based again on Officer Simmons' conversation with Ms. Bullock, that Defendant may be carrying a handgun and, therefore, the subsequent *Terry* frisk of Defendant for officer safety was similarly proper. Finding no merit in Defendant's contentions to the contrary, the Court finds that the requisite reasonable suspicion to conduct an investigatory *Terry* stop and frisk of Defendant was present in this case. Accordingly, it is recommended that Defendant's motion to suppress be denied.

## CONCLUSION

The Court **RECOMMENDS** that Defendant's Motion to Suppress [DE-29] be **DENIED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds

of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 4th day of November, 2011.

DAVID W. DANIEL
United States Magistrate Judge